Council, before we start, I think there's a preliminary matter that we have to dispose of. Digital Angel has proposed certain demonstrative aids for oral argument. And there's been an objection, and I gather, I didn't read the objection as being to the effect that these items were not before the district court, but rather that they were sort of some form of improper advertising. I think the word was used at oral argument. Is that correct? Yes, I will withdraw those objections. Because it appeared from the record that this material, for whatever it was worth, was presented to the district court. I'm sure I noticed one of them I thought had not. Okay, fine. I appreciate that. Thank you, counsel. The one thing I will say, and I'm not articulating just my view, but also the view of my panel colleagues on this, is that often it's been found that these kinds of aids at oral argument are more of a distraction and hindrance to counsel than an aid. Because typically what happens, counsel will be up there, they have to go over and point to something, then they step back. The flow of the argument is lost. I just mentioned that, Mr. Pocatillo, to emphasize that you can use your time as you wish, but often the aids don't help that much one way or the other in the case. And we do have a good sense of the language of the license and so forth. Just wanted to confirm, you've reserved five minutes for your rebuttal? Yes, I have. Okay, and you have a sense of how the lighting system works? Yes, I do. Okay, well you can start whenever you're ready then. Good afternoon, Your Honors. May it please the Court, my name is Stephen Pocatillo, for Digital Angel, and with me is Mr. Cantone, also from my law firm. And yes, mindful of the argument, what we've put up is one board that has the principal language in dispute. And yes, I'm sure you've read it if you've heard anything about this case. You can't avoid it. You can't avoid it because it's the single issue in the case, and that is basically the lower court's holding that the term acquired in the context of paragraph 3A of the license agreement basically is that it can mean only the purchase of transponders and precludes an assignment or purchase of technology or proprietary rights. And we believe that that really produces an absurd result when looked at in the context of a license agreement. But isn't that what the license says? It says, your license to make, have made, use, and sell, one, Allflex designed and developed electronic identification systems, or two, and I'm adding the numbers, electronic identification systems, not technology, but electronic identification systems that are acquired or licensed by Allflex. And the systems are defined elsewhere in the license agreement to refer to either systems or component parts of systems, not technology. So isn't that what the license says? Well, first of all, I would have read to the end of the sentence that said, which are covered by destron, syringe, and plannable identification transponder rights because now we're talking about a claim of a technological product that includes certain components and elements, including a coil, an integrated circuit chip, an encapsulant that is all put together and requires a design and a technology. And you may recall that attachment B of the agreement indicates that on the date this agreement is signed, Allflex acknowledges they don't have a design yet. So let's begin with that premise. They don't have a design yet. On the day this agreement is designed, it's within the four corners of the agreement. Well, that's fine. So you're not covered by the first of the clauses I read, but the second clause is implicated. And right. So now let's go back and look at the analysis that we do here. What we have here between the language, which are covered by destron, syringe, and plannable identification, transponder patent rights, and the to make, have made, use, and sell is what we would often call the licensed products language that is traditional in the license agreement. And what are those licensed products? So we now look and we understand from the record that they are electronic identification systems as defined in the agreement. But they're limited. They're limited either because they have to be Allflex designed and developed. I'm with you so far. What? I'm with you so far. Or they have to be licensed by Allflex number three. Well, don't forget the acquired part. We're going to get there. Or they have to be acquired. You saved the best for last. Well, yes. And always.  Anyway. The point I make, Your Honor, is this. That in each of these situations, starting with design and develop, if you design and develop your own technology, you own it. You can use it free. If you license technology, you pay for the right to use it, and then you have the right to use it. We submit that it's used here, the word acquired, referred to the idea that you had to acquire the technology. Or you had to acquire an assignment or a company that owned that technology or some other method in order to get that technology. That is the limitation. Now, let me just ask you specifically about that. And I find that to be a difficult read on that language. But, assuming that that's what it says, are you telling me that had Olflex, instead of just purchasing these components from Sochimat, first sought out and obtained from Sochimat a license, royalty-free license, then they would be free to sell these things? Well, royalty-free license might have been a sham. Bottom line is that that would have been a sham. So that's what the agreement was written to cover? Instead of just going to Sochimat saying, we'd like to purchase these for resale under our license, they would say, well, we'd like to purchase these for resale, but first we need a license. Can you give us a license, and then we'll purchase them and resale them? If the license were an arms-length, independent, royalty-free license, Sochimat would be giving up the right to ultimately sell. They would hand them over their technology. They would teach them how to do it. They would license the technology. And now they could be taken out of the business by Olflex. That's why there's no license here. Non-exclusive license. Weren't it so easy, they would have given them the piece of paper. But that would be a sham. You're asking for a construction of this agreement that's not only contrary to the language but, frankly, a little far-fetched in terms of any kind of reasonable objective of a licensor in such an arrangement. It just doesn't make any sense to me. Well, if you look at it as the identity of the grant of intellectual property rights here, and you're looking at what rights were given, you start with the fact that the agreement was originally negotiated with Olflex Design and Developed Electronic Identification Systems. Later, the terms acquired or licensed are added. Now, I think that you do agree, I think, from your question that licensing does imply that you do get a grant of rights from someone else. That is an intellectual property concept and a grant of rights that would give you the right to use it. So in asking me the question, well, yes, if you get a license, you get the rights. Why is that far-fetched when you say, well, you could have gotten a royalty-free license? Well, then why isn't that also applicable to an acquisition of rights or an assignment of rights? What if they bought a company that owned the rights? Well, even assuming you're correct and it does apply when you acquire intellectual property rights or license intellectual property rights, the word acquired is not limited and follows immediately after the expression electronic identification systems. So why are you excluding the purchase of products? Because the judge's – and that's the nub of the case. That's why I asked. The judge's construction – I'm sorry. The judge's construction – forgive me for my enthusiasm – but the judge's construction, Judge, is this. She says it can't mean that. Her definition that she reaches is it only means the acquisition, the physical acquisition of product, and precludes the acquisition of technology. Now, I'm suggesting to you that that's not possible. She said it precludes? Where does she say that? She says in responding to – well, first of all, that's the implication of the decision because – Okay, but you said she said. Where did she say? Well, okay. I'm sorry. Maybe perhaps it was in response to our claim where we say defendant claims – I'll come back to that in my reply so I can not change the argument. But what happens is that when she finds – if she finds – I'll give you why the consequence of that is so. If she finds that it means – it could mean the acquisition of intellectual property rights, then that plausible definition of the agreement takes us to a trial. It gives us discovery. It opens up the term to whether it's ambiguous or not because under Eighth Circuit law, if there's any plausible interpretation of the agreement that would support our position, you then cannot find a judgment on the pleadings. You're saying – So therefore – Mr. Spocatelli, your position is that this only covers the acquisition of property rights, not products. Well, exactly. That is exactly our position. Then why does the sublicense refer to acquiring product from other people at the top of page 526? The sublicense, which is the next sentence? Yeah. Yes. The next sublicense refers to the have-made rights under the agreement, and it's quite limited. It says for the have-made rights, you can only get – go to a third party and have them make product pursuant to the license. Now, pursuant to the license grant above means you have to have either designed and developed it, acquired the technology, or licensed the technology. It's entirely consistent with it. As a matter of fact, the fact that they narrowed the sublicense items demonstrates to you that it's an intellectual property provision rather than a personal property provision. Yeah. How does it do that? Because why would you – if you had the right to acquire it, what difference would it make about sublicensing? I don't understand what you're saying. Okay. If I can go out and buy it anywhere for resale, why would I be limited in my certain rights to sublicense? If I – Soki Matt is that – why doesn't Soki Matt come under the sublicense rights? Because it's not a sublicensee. It was an absolute arms-length third-party manufacturer. Yet the sublicense provision is very specific. It says you can only sublicense someone pursuant to the rights above, which are the rights to make, use, sell, or have made. But the sublicense provision does contemplate that you will be buying component parts, transponders, from third parties, right? From a third party based on a design – again – But it doesn't say based on a design in the subright. It says based on the above. Doesn't the language – I mean, forgive me, Judge. I'll do it this way. It says precisely that it limits those rights in the sublicensing language. It says the aforementioned license – the aforementioned license, that was the word used – includes the right to grant sublicense. That's the right to have it made, but only pursuant to a design that was either designed or developed, licensed, or acquired. Now, when you think about it, it makes sense. Otherwise, why would you be mentioning the aforementioned license? And why would you be limiting the sublicense? I mean, this is very interesting because this was a point raised in the case – cited in one of the cases, which is the DuPont case. Mr. Potil, let me ask you, and I will confess that this question will reveal my lack of business acumen, but I'm being very sincere. I don't understand how this is supposed to work. Allflex goes out and gets a license from Sokeymat, right? Allflex goes – no, Allflex didn't go out and get a license. No, no, but this is what is supposed to happen. They're supposed to get a license of the technology from Sokeymat. Why – and this is – and tell me if I'm really missing something – but why does – why would Sokeymat have the Digital Angel technology? Oh, okay. Do you see what I'm saying? Yes. In one of the cases that's cited – some of the cases that are cited are what they call IC foundry-like cases. One of the elements of the claim you have to develop is an IC chip, and then you have to develop a whole design for the way in which the IC chip is mounted on the board and is mounted on the coil and then encapsulated. That design, but particularly the IC chip design, is a proprietary design, and what you need to do is go forward and get a license or someone to make that product for you based on your own design. That was the contemplation of the agreement. Presumably Sokeymat will have gotten something from Digital Angel. Well, Sokeymat doesn't necessarily need it because they have their own design, but Sokeymat doesn't have a license from Digital Angel. That's the point here. They've created their own fabrication technique for their own IC chip, which they incorporated into the product, but they're not licensed. So they can't get any rights from Sokeymat, but they need an Olflex to make sure it's imported. Let me try again here. The definition of electronic identification system, if you adopt your reading of that, doesn't this license say that they not only have to design or acquire intellectual property rights to the entire technology, but that they have to design and acquire intellectual property rights to every component in the technology? No, it doesn't. It doesn't say that. Why doesn't it say that? It doesn't say that because you're reading out the words covered by the Destron IP transponder rights, which is at the end of that clause, which means they only need a license to practice the part of the invention that's covered by the patent. Remember, this grant clause is a forbearance on rights. We're saying we won't sue you as long as the transponder component of the electronic identification system, that component, meets these requirements. Only the transponder? What about the whole system? The whole system? The patent doesn't cover the scanner. It doesn't cover the solution. So in your theory, even though the appellee here designs the entire system, it can't acquire a transponder from somebody else unless they also design the transponder as well as the entire system? No, no. No? No, no. No. The transponder part, the part that is, quote, covered by Destron's syringing plan of identification, that part of the system has to be pursuant to a proprietary decision. They either invent or they acquire or they license. I don't understand that because the entire system, if it included the transponder, would be an infringement, right? If it included the transponder, it would be an infringement. Okay, so what you're saying is that they have to design the entire system and they have to design the transponder. I'm saying they have to design the transponder. They can get the rest of the system from other people. I don't understand how you can, under your reading, I don't understand how you can read that in here. Because the limitation on the design and development of the electronic identification system is modified by the words which are covered by it. The system is covered by the patents if it includes a transponder, right? It does. I agree with you. But if they start with a transponder that meets the license, the rest of it then can be acquired elsewhere because that's not a, those are components you can buy off the shelf. So they don't have to design the overall system in your view? No, they only have to design the part of the system that's covered by the patent license. I don't understand how that can be consistent with your reading of this clause. Well, it varies because the products that are designed and developed, electronic, well, let me say this to you if I can. If I can jump ahead, in the proffer that was made under Rule 56F, we submitted a declaration to Mr. Geisler. He was then, at that time, the president of Destro. He negotiated this agreement. In his declaration, he says they negotiated an agreement in which, since this company was now going to come into the business and be a competitor, he wanted to make sure that they would not only pay a royalty, but that they would invest in the technology. And in particular, they would invest in the custom IC, integrated circuit chip, that was needed to make the transponder. He therefore negotiated the agreement in order to come up with a system that says that they would either, initially they were going to design and develop it. And that was the understanding. They came to him and said, what if we can buy it from someone, the technology, or what if we can get a license from the technology? They added those terms to the agreement. He says it in a very plausible recitation of the facts as one of the negotiators of the agreement. OK, Mr. Pocatillo, you've gone well into your – no, no, you've been peppered with questions here, and you've been responding. It's not your fault. But I do think we ought to cut this part of the argument off now and hear from Mr. Martin. But what we'll do is we'll give you – you've basically now had 17, 18 minutes of oral argument. So – no, you've had more than that. You've had 20, 22 minutes about. Twenty-two. Yeah, OK. So we will give you your full rebuttal if you need it, and we'll hear from the other side. Mr. Martin? And if you need it, we'll – since Mr. Pocatillo had additional time, we'll give you an additional six minutes should you need it. I'm hoping not to use it. That's fine. You don't have to. But in any event – you know, because he's had more time, so you ought to have – he's going to in toto have more time, so you ought to have it also. Yes, Dennis Martin for L.A. May it please the Court, after going through these briefs and developing alternate hypotheses about what various terms meant, I went back to the Court's opinion, and I had a very district court's opinion, and I found that we hadn't done much to improve on it. She said basically, in my reading of the Court's opinion, is that it does not purport to establish a definition for acquired that says it is confined only to one kind of property or the other. She says acquired means get a hold of whatever the verbiage she used. Either products or technical rights. Right, and that's not carelessness, I don't believe, in drafting. I think that's the sensible way to do it because you're talking about both in the definition of EID systems. So, in our briefing of the motion originally, and now, we were not looking for an ultimate definition for every term, but rather what do we know about this definition. We do know about this definition, whether it does or does not include or refer to intellectual property, it certainly does not exclude tangible property, and when you have what is in effect a merger of intellectual property rights and tangible property rights, an implied license in a product that you buy from someone that has property in it, then it really doesn't make any difference. I think the cases that we cited, the boundary cases, Cyrix and Intel, they're certainly different procedurally in that they don't arise out of a motion for judgment on the plea, but the lesson there is the same, is that if you don't put an important provision into your license agreement, nobody is going to write it there for you. They may have a good faith belief, Mr. Geiser might have a good faith belief, but there's nothing in that clause, acquired or licensed, that would put an obligation on Allflicks to go out and acquire intellectual property rights in each of the components as to an invention, whereas just acquired intellectual property rights, overlapping one would think, from the licensor, why would you do that? Maybe there's a reason why you would do that, but it's not self-evident from this license agreement. It says nothing about it at all. You can't be your own lexicographer in a contract. It takes two, and this particular clause is written broadly. You see it in the—I'm going to respond briefly on the point about the sub-license to Sokiemat. The ability to license Sokiemat is to license Sokiemat to act as a boundary for us. That's all that's referred to there. It's entirely different from the subject of whether Sokiemat has to license us with intellectual property. Unless the court has a particular question, I'll concede my time. Smart. No, thank you. You're a man of more than your word. Thank you. Mr. Pocatillo, you do have your five minutes if you need it. Thank you. Coming back to your question, Your Honor, it says here, despite plaintiff's contention to the contrary—this is at A18— the agreement speaks directly to the issue of whether defendants are required to acquire proprietary rights of transponders before they are allowed to sell them under the agreement. In short, no such requirement exists. That's where she says that. I will also submit that if Mr. Morton is suggesting to you that it doesn't preclude the possibility or the interpretation of acquiring intellectual property rights or property rights in the technology, I would suggest to you if, in fact, that is a plausible explanation that that language in the agreement contemplates acquiring proprietary technology, then under the circumstances it was improper to grant judgment on the pleadings. In order to establish that the court should be reversed, we only have to establish that that is a plausible definition under the agreement, at which case we would have gone forward in the case and judgment on the pleadings would have been improper. The standard in the Eighth Circuit, as well as in most circuits, is very high. It requires a very high showing, and if there's any theory under which there's an inference based on the language or the facts that would suggest a plausible theory, then you go forward in order to prove that theory. In this case, I submit to the court the only way that you can get to the final result is you have to reach the conclusion that this agreement does not possibly contemplate the acquisition of a business or intellectual property rights by assignment and that it was solely intended to give a right to sit there and obtain a physical product. I submit to you in the context of an intellectual property agreement, that's a stretch. I understand the words not used because it's drafted by sophisticated draftsmen that write intellectual property agreements. Look at the parallel construction, acquired or licensed. You write these agreements every day. Mr. Pocatiel, are you saying that that clause, this is the clause that says electronic systems that are acquired or licensed by Allflex, in effect makes licensed devices only those devices which are manufactured by Allflex? No, no. That would be the – not only. It could be based on the sublicense rights we discussed or its sublicensee pursuant to the agreement. I can't say that only because the grant clause gives them a right to make it, use it, sell it, or have it made pursuant to these rights, and the sublicense clause is an exception. I'd like to answer your question, yes, but – So the only thing they have a right to sublicense other people to make are things that they either designed or developed or acquired rights from others? Or licensed rights. Those three possibilities, yes. And what if there's a component which is not proprietary? It's a public domain item for which no license is necessary. They're precluded from having that made? Well, are you asking me in 1996 when they bought the agreement or now? I guess because the question – what it meant in 1996 – Well, I'm asking you what the agreement means. Okay. In 1996, it meant – 1994, I'm sorry. It meant exactly what I'm saying, that they had to go out and get these fab rights, fabrication rights, on their chip from someone. I don't know the answer today, but I still think those are proprietary agreements. The foundries still require proprietary designs. I don't think – you couldn't go out and just buy this chip out in the open market. This is a very unusual case. It's not every case where a patentee sues a licensee who is either paying or willing to pay a license. And may I point out – Royalty. – that there is – one of the reasons why this occurred and was another issue outside the pleadings that we discussed in oral argument is they sent us a letter, which is printed at a – I think it's a – I'll find it. Yeah, but usually, patentees are more than happy to get that royalty paycheck. Well, as Mr. Geisler points out in our Rule 56-F showing, he points out that they wanted – because this was an emerging industry, he wanted to be able to have them – he wanted them to make an investment in the technology. The last point I was going to make is Mr. Geisler pointed out at the time he was suing another company in Europe named Trovan that was making this transponder. He was suing them for patent infringement, and under this interpretation, Allflex could have gone to – after we got the injunction from – after Digital Angel got the injunction against Trovan, these people could have gone right to Trovan and bought their transponder and circumvented the injunction in the lawsuit. It would have made no sense to give them a right to just purchase for resale a product. Mr. Pugatillo, thank you. Thank you.